Paul L. More, SBN 9628
Sarah Varela, SBN 12886
Kim Weber, SBN 14434
**McCRACKEN, STEMERMAN & HOLSBERRY, LLP**
1630 South Commerce Street, Suite 1-A
Las Vegas, NV 89102
Tel: (702)386-5107
Fax: (702)386-9848
E-mail:  pmore@msh.law

*Attorneys for Plaintiff Local Joint Executive Board*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS | CASE NO. |
| Plaintiff, | JUDGE: |
| v. | **COMPLAINT FOR INJNCTIVE RELIEF AND ABATEMENT** |
| HARRAH'S LAS VEGAS LLC; THE SIGNATURE CONDOMINIUMS LLC; BELLAGIO LLC, | (28 U.S.C. §§ 1337; 29 U.S.C. § 185) |
| Defendants. | |

## INTRODUCTION

1.      Petitioner Local Joint Executive Board of Las Vegas ("Joint Board") brings this action for injunctive relief under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, and asserting a cause of action for statutory nuisance under Nevada law against Defendants Harrah's Las Vegas LLC ("Harrah's"), The Signature Condominiums LLC ("Signature"); and Bellagio LLC ("Bellagio").

2.      The SARS-CoV-2 virus and the associated COVID-19 disease is a highly contagious respiratory virus that causes long-term health complications, including lung inflammation, clogging of

air lung sacs, sharp reductions in oxygen supply, blood clots, organ failure, intestinal damage, heart inflammation, liver problems, neurological malfunction, acute kidney disease, and death. As of the filing of this complaint, more than 14,000 Nevadans have contracted the disease, and nearly 500 Nevadans have died. Since March 1, 2020, at least nineteen Joint Board members and dependents have died from the disease. Both the incidence of COVID-19 and COVID-related deaths have been concentrated among working-class Latino and African-American residents, who make up many of the Joint Board's members. While much remains to be discovered about COVID-19, it is clear that the disease is readily transmitted between humans. Human respiratory viral infections are transmitted through direct contact (touching an infected person, usually the hands), indirect contact (touching contaminated objects), and airborne droplets and aerosols.

3.      Since Las Vegas's gaming industry reopened on June 4, 2020, Defendants have adopted unreasonable rules and procedures for addressing the spread of COVID-19. These rules do not include critical elements necessary to protect Joint Board members, their families, and their communities from COVID-19 infection. Specifically, Defendants' rules and procedures for responding to workers contracting COVID-19 have been wholly and dangerously inadequate. Defendants have not immediately shut down food-and-beverage venues and other work areas upon learning of positive COVID-19 cases. They have failed to conduct adequate contact tracing prior to permitting employees who worked with positive co-workers to return to work. They have failed to immediately inform their employees of positive tests among their co-workers, leaving workers who are particularly vulnerable to COVID-19 because of pre-existing conditions (or who live with family members who are particularly vulnerable) guessing as to what precautions they must take. Defendants have provided workers with flatly false information about how COVID-19 spreads and what its symptoms are, in an effort to keep workers on the job and revenues flowing. The unreasonable rules and procedures that Defendants have adopted for addressing positive COVID-19 cases among their workers place the life and health of Joint Board members, their families, and their communities in grave danger.

4.      Moreover, despite the overwhelming evidence of COVID-19's spread through airborne droplets, and despite the overwhelming public-health consensus that mandatory facial covering is

essential to preventing COVID-19's transmission, Defendants have stubbornly refused to require their guests to wear face coverings while in public areas of their hotels and casinos, or while having direct contact with workers.  Defendants have maintained the unreasonable rule that their guests must only be "encouraged" to wear face coverings, but should not be required to wear them.  The result is that Joint Board members have regularly been required to interact with many dozens of guests who are wearing no facial covering, putting these members' safety, and that of their families and communities, at risk.  Defendants have adopted this unreasonable rule even as they have recognized the critical importance of facial covering to preventing COVID-19's spread and protecting public health by *requiring their own workers to wear facial coverings* at all times.

5.     Defendants are each parties to collective bargaining agreements with the Joint Board.  Each of those collective bargaining agreements permits the Joint Board to file grievances against Defendants where the Defendant has adopted an unreasonable work rule.  Defendants Signature and Bellagio have each contractually affirmed that that "the safety of its employees is of paramount concern and that it will take reasonable measures to provide a safe workplace for all employees."  The Joint Board has filed grievances against each Defendant, challenging the foregoing unreasonable rules and procedures.  Absent interim injunctive relief, however, any arbitration on these unsafe rules and procedures will be a hollow formality because an arbitrator will not be able to remedy workers' exposure to COVID-19 or workers contracting the disease and spreading it to their families and communities.  Plaintiffs therefore seek an injunction in aid of arbitration under Labor-Management Relations Act Section 301, 29 U.S.C. § 185.

6.     Nevada's nuisance statute, NRS 40.140, creates a cause of action against use of property in a manner "which is injurious to health . . .  so as to interfere with the comfortable enjoyment of life[.]"  Defendants' rules and procedures have created conditions that are injurious to the health of Joint Board members, and that have and will interfere with their comfortable enjoyment of life.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the present dispute pursuant to federal question jurisdiction, 28 U.S.C. § 1331 and 29 U.S.C. § 185(a) of the Labor Management Relations Act

("LMRA").  This Court also has jurisdiction pursuant to 28 U.S.C. § 1337 because the case arises under an Act of Congress regulating commerce.  The Court has jurisdiction over Plaintiff's pendent state-law claims under 28 U.S.C. § 1367.

8       Venue is proper in this Court because Plaintiff and all Defendants conduct business in this district and all Defendants are parties to collective bargaining agreements entered into and performed in this district.

## PARTIES

9.      Plaintiff Local Joint Executive Board of Las Vegas, a joint bargaining agency consisting of  Culinary Workers Union, Local 226 and Bartenders Union, Local 165, is a labor organization as that term is defined in Section 2(5) of the Labor Management Relations Act, as amended, 29 U.S.C. Section 152(5)with its principal place of business Clark County, Nevada.  The Joint Board is an unincorporated association that represents approximately 65,000 workers in Southern Nevada in most of the hotel-casinos on the Las Vegas Strip and in Downtown Las Vegas, including the Defendants.  The Union brings this action on its own behalf and on behalf of its members.  The Union has associational standing to represent its individual members' interests, under *United Food and Commercial Workers Local 571 v. Brown Group, Inc.*, 517 U.S. 544, 551-553 (1996).

10.     Defendant Signature is an employer within the meaning of Section 2(2) of the Labor Management Relations Act, as amended, 29 U.S.C. Section 152(2), and operates the Signature at MGM Grand in Clark County, Nevada.  Signature is a majority-owned subsidiary of MGM Resorts International ("MGM Resorts" or "MGM").

11.     Defendant Harrah's is an employer within the meaning of Section 2(2) of the Labor Management Relations Act, as amended, 29 U.S.C. Section 152(2), and operates the Harrah's Las Vegas Hotel and Casino in Clark County, Nevada.

12.     Defendant Bellagio is an employer within the meaning of Section 2(2) of the Labor Management Relations Act, as amended, 29 U.S.C. Section 152(2), and operates the Bellagio Hotel and Casino in Clark County, Nevada.  Bellagio is a wholly-owned subsidiary of MGM.

13.     The true names and capacities of DOES 1 through 100, inclusive, are unknown to Plaintiff at this time, and Plaintiff therefore sues Defendants under fictitious names.  Plaintiff is

4

informed and believes, and thereon alleges, that each Defendant designated as a DOE is in some manner responsible for the occurrences alleged herein, and that Plaintiff's injuries and those of its members, as alleged herein, were proximately caused by the conduct of such DOE Defendants. Plaintiff will seek leave of Court to amend this complaint to allege the true names and capacities of such DOE Defendants when ascertained.

## RELEVANT FACTS

### Common Allegations

14.     COVID-19 is a highly contagious viral respiratory disease that can cause serious, long-term health complications, including blood clotting, strokes, embolisms, heart and lung damage, and neurological symptoms.  COVID-19 is associated with Multisystem Inflammatory Syndrome in some young children.  Some 2.3 million people in the United States have contracted COVID-19 and 120,333 people have died from the disease.  Some 14,000 Nevada residents have contracted COVID-19, and nearly 500 have died, with over 400 of those deaths occurring in Clark County.  COVID-19 cases and deaths are especially concentrated in the Latino and African-American communities.  As of June 23, 2020, fully 56% of confirmed COVID-19 cases in the State were African-American and Latino residents.  One reason for the concentration of COVID-19 cases and deaths among African-American and Latino people, according to the CDC, is the concentration of African-American and Latino workers in service-sector jobs, like the jobs held by Joint Board members at Las Vegas's casinos and hotels. Indeed, since March 1, 2020, at least nineteen Joint Board members and their dependents have died from COVID-19.

15.     People with COVID-19 have had a wide range of symptoms reported, according to the Centers for Disease Control ("CDC"), ranging from mild symptoms to severe illness.  Symptoms may appear between 2 and 14 days after exposure to the virus, and may include fever or chills; cough; shortness of breath or difficulty breathing; fatigue; muscle or body aches; headache; new loss of taste or smell; sore throat; congestion or runny nose; nausea or vomiting; and diarrhea.  The CDC warns that this list does not include all possible symptoms.  There is also strong evidence that people infected with COVID-19 who have not yet developed—or who never develop—symptoms can spread the virus. Researchers reported in March that asymptomatic patients have similar upper respiratory viral loads to

people exhibiting symptoms.  Zou L, Ruan F, Huang M, et al., SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients, New England J Med, 2020;382(12):1177-1179.

16.     The current scientific consensus is that COVID-19 is transmitted through direct contact (touching an infected person, usually the hands), indirect contact (touching contaminated objects [fomites]) and airborne droplets expelled by coughing, sneezing, speech, and even ordinary breathing. These droplets can remain in the air for up to fifteen to twenty minutes before falling to the ground or onto other surfaces within a few meters. There is growing scientific concern that smaller particles known as "aerosols" that remain in the air for much longer, may transmit the virus for a period of hours over longer distances.  In addition to the direct threat of being inhaled by or landing on others, expelled droplets are also the prime source of indirect transmission through the creation of fomites.

17.     In laboratory conditions, COVID-19 remains viable in aerosols for up to three hours in the air.  Viable virus remains on a number of surfaces for a day or longer after being applied with droplets, notably plastic (72 to 144 hours), stainless steel (72 to 144 hours), glass (72 hours), and cardboard (24 hours).  Preventive public health measures have focused on suppressing direct and indirect transmission through hand to hand contact, the touching of common surfaces, and the spraying of droplets within a six-foot diameter through speech, coughing, and sneezing.

18.     Recent research from the CDC provides evidence that a single person with COVID-19 is likely to infect *five or six* other individuals absent active surveillance for the disease, aggressive contact tracing, quarantine, and early strong social distancing efforts when a positive case is detected.  Sanche S, Lin Y, Xu C, et al. High Contagiousness and Rapid Spread of Severe Acute Respiratory Syndrome Coronavirus 2. *Emerging Infectious Diseases*. 2020;26(7):1470-1477.

19.     Given this high rate of transmission, public-health authorities have stressed the need for rigorous work-area closure, contact tracing, and quarantine procedures in the event of a positive COVID-19 case in the workplace.  The CDC's "Interim Guidance for Businesses and Employers Responding to Coronavirus Disease 2019 (COVID-19) (May 2020) instructs employers that in the event of an employee's positive COVID-19 test, "[i]f it has been less than 7 days since the sick employee has been in the facility, close off any areas used for prolonged periods of time by the sick

person[.]"  The CDC also recommends that the employer "[w]ait 24 hours before cleaning and disinfecting to minimize potential for other employees being exposed to respiratory droplets."

20.     The Southern Nevada Health District's "Guidance for Food Establishments if an Employee Becomes Ill with COVID-19" states that a food establishment should: (1) "[e]xclude confirmed/suspected employees"; (2) "[i]nform fellow employees of their possible exposure to COVID-19 in the workplace but maintain confidentiality"; (3) "[a]reas used by ill employees should be closed off for 24 hours and allowed to ventilate . . . Areas not visited by ill employees can remain open"; and (4) "[c]lean and disinfect all areas visited by ill employees" using approved products.

21.     Public health officials also stress the role of employers in contact tracing and ensuring that co-workers and patrons potentially exposed to COVID-19 are advised of their potential exposure and quarantined.  The CDC advises that if an employee is suspected or confirmed to have COVID-19, the employer should "[d]etermine which employees may have been exposed to the virus and may need to take additional precautions[.]"  Employers should "[i]nform employees of their possible exposure to COVID-19 in the workplace but maintain confidentiality as required" by federal and state law. Employers should also "instruct potentially exposed employees to stay home for 14 days[,]" the maximum incubation period of the virus.  The CDC defines "exposure" to mean contact with a person with confirmed or suspected COVID-19 within six feet for a period of 15 minutes or more.  The CDC warns, however, that "[d]ata to inform the definition of close contact are limited.  Factors to consider when defining close contact include proximity, the duration of exposure (e.g., longer exposure time likely increases exposure risk), and whether the exposure was to a person with symptoms (e.g., coughing likely increases exposure risk)."  Those who have been exposed or potentially exposed to COVID-19 are advised to stay home in self-quarantine until 14 days after the last exposure and maintain social distance of at least 6 feet from all others.

22.     To be effective, contact-tracing needs to be rigorous and performed by competent, trained individuals and begun immediately.  The CDC, in its Case Investigation and Contact Tracing principles, advises that "[t]o be done effectively, [contact tracing] requires people with the training, supervision, and access to social and medical support for patients and contacts."  The CDC further advises that "[t]ime is of the essence" because "[i]f communities are unable to effectively isolate

patients and ensure contacts can separate themselves from others, rapid community spread of COVID-19 is likely to increase to the point that strict mitigation strategies will again be needed to contain the virus."  Accordingly, the CDC advises that case investigators and contact tracers "[i]mmediately identify and interview people with SARS CoV-2 infections and COVID-19."  The CDC also recommends that contact tracers "[w]arn contacts of their exposure, assess their symptoms and risk, and provide instructions for next steps."  In its June 18, 2020, guidance on "Considerations for Casinos and Gaming Operations," the CDC advised that employers should "designate a staff member for each shift to be responsible for responding to COVID-19 concerns.  All staff should know who this person is and how to contact them."

23.     Recent statistical studies demonstrate that *mandated* face covering—as opposed to suggested or recommended guidelines—is not only an important intervention to prevent the spread of COVID-19 disease but may even be the single most critical.  Dr. Renyi Zhang and colleagues from Texas A&M University analyzed data on infection in Wuhan Province China, Italy and New York City. Since Wuhan required face covering at the same time as other critical interventions while Italy and New York did so at different times than other interventions, it is possible to separate the impact of mandated mask wearing from other policy interventions when examining the change in cases over time. They conclude in an article published on June 12 in the *Proceedings of the National Academy of Sciences* that mandated orders to wear masks in public "significantly reduced the number of infections, that is, by over 78,000 in Italy from April 6 to May 9 and over 66,000 in New York City from April 17 to May 9."  A "natural experiment" study comparing changes in county-level data in states in which face masks were mandated in public found "a significant decline in daily COVID-19 growth rate after mandating facial covers in public, with the effect increasing over time after signing the order," leading to an estimated hundreds of thousands of avoided COVID-19 cases.  Wei Lyu and George L. Wehby, Community Use of Face Masks and COVID-19: Evidence From a Natural Experiment of State Mandates in the US, Health Affairs 39, No. 8 (2020): 1–7.

24.     The scale and nature of the operations of casino hotels add an additional level of risk of spread, both within a casino hotel and outside of the property.  Ambient noise in casinos—recorded and live music, slot machine and gaming floor noise—exceeds the level of normal conversation.  Published

estimates for ambient casino noise range from 73 to 85 decibels, whereas normal speech is roughly 60 decibels.  Thus, casinos and casino hotels gather people together in an environment in which simply making oneself heard requires more forceful speech than in a quieter environment and thus increases both the number of droplets issuing from customers and the force with which they are issued.  Add alcohol and the exuberance that comes with gaming wins and live entertainment, and casino hotels are a place where speech is much louder than normal.  In one National Institutes of Health study, researchers found that louder speech produced peak droplet volumes 53% higher than the lowest recording for quieter speech.  Anfinrud, P., Stadnytskyi, V., Bax, C., Bax, A., Visualizing Speech-Generated Oral Fluid Droplets with Laser Light Scattering, N Engl J Med 2020; 382:2061-2063 Published 5/21/2020 DOI: 10.1056/NEJMc2007800.

25.     Despite the overwhelming evidence of the importance of mandating facial coverings by guests in public areas of casinos and hotels, Defendants—along with other casinos and hotels in Southern Nevada—only "encouraged" guests to wear face masks while in public areas until June 24, 2020, the day that Nevada's Governor ordered guests to wear them.  Defendants recognized the critical importance of mask wearing to preventing the spread of COVID-19 and maintaining a safe workplace by *requiring their own employees* to wear masks at all times after Nevada's casinos reopened on June 4, 2020.  But they adopted rules that place their own employees at risk of contracting COVID-19 from guests who fail to heed public-health advice.

26.     On June 15, 2020, Southern Nevada's Acting Chief Health Officer decried Defendants' and other casinos and hotels' rules permitting guests to be in public without face masks: "While growing evidence is showing that face coverings can be one of the most effective tools for slowing community transmission of the virus, unfortunately, it has faced opposition from limited segments of the population and reluctancy from some local business to properly request it from its patrons. *Employees of local businesses are putting themselves at risk to provide services to the public who are not wearing masks*. They are wearing masks to protect the people they are serving, whether these are Nevada residents or out of State visitors, and they deserve proper support from managers and leaders of their industries who *must act responsibly by requiring patrons to wear masks or face coverings at their establishments*. Businesses have a moral obligation to protect this community by implementing policies

*that require their patrons to wear masks in public areas*; it will certainly contribute to the decrease of coronavirus spread in Clark County, and the State of Nevada."  Despite this admonition from Southern Nevada's chief public health expert, Defendants maintained rules requiring their workers to serve guests in close proximity, while permitting those guests to go without face masks.

27.     Through the first 20 days that Nevada's casinos were reopened, and despite the clear public-health consensus that mandatory mask wearing was essential to preventing the spread of COVID-19, Defendants allowed their guests to enter their properties and interact with Joint Board members without wearing any facial covering.  This irresponsible act undoubtedly led to spread of COVID-19 among Joint Board members.

28.     Nevada permitted the State's casinos to reopen on June 4, 2020.  COVID-19 cases in Clark County have risen precipitously since that date.  According to the Southern Nevada Health District, cases increased from a 7-day moving average of 124.4 on June 5, 2020 to a 7-day moving average of 217.3 on June 18.  On June 27, 2020, Clark County set a single-day record high with 971 new cases.

### Signature Allegations

29.     The Signature at MGM Grand is an all-suite resort that is adjacent to MGM Grand hotel-casino.  The Signature consists of three Towers (Towers 1, 2, and 3), each of which contains approximately 575 furnished units.  Some of the units are privately owned, and many of these are rented to the public by the owner through a common rental program.  Other rooms are owned by Signature and rented directly to the public as suite accommodations.

30.     Prior to closure due to the pandemic, The Signature had lobby registration, valet service, bell service, and door service at each of the three Towers.  After it reopened on June 4, The Signature moved all front-desk registration, valet, bell, and door service to Tower 2.  The Signature also scheduled far fewer valets and bell persons to work than it had prior to closure.  The result of consolidating all services at one Tower with fewer scheduled workers was predictable: chaos.  Long lines of cars waiting for valet service regularly stretch out of the hotel's porte cochere toward East Harmon Avenue.  Guests waiting for their parked cars congregate in the area under and around the porte cochere.  Prior to the State's mandate of universal face masks, most guests did not wear face

masks while in the area under or around the porte cochere, or while inside of The Signature.  It is often so crowded outside of the Tower 2 lobby that Signature employees are required to zig zag through throngs of guests, coming into close proximity to them.

31.     The bell desk is situated in the porte cochere of Tower 2.  Although bell people have direct interactions with unmasked guests, The Signature did not erect any plexiglass shield at the bell desk until on or around June 25, 2020.  The bell desk is located close to the hotel's wall, making it impossible for bell people to move to a socially distanced location when speaking with guests at the bell desk.  The Signature did not erect any markings on the pavement around the bell desk indicating the distance at which guests should interact with bell persons, nor did The Signature erect any stanchions or other equipment that would indicate to unmasked guests the socially distanced location at which to stand.  As a result, bell persons regularly had interactions at the bell desk with unmasked guests who are within six feet of the bell persons.  Until very recently, there was no plexiglass barrier between these bell persons and the unmasked guests they were required to interact with.   Groups of unmasked guests frequently congregated within close proximity of the bell desk when the porte cochere was crowded.  It is loud in the porte cochere, so guests frequently have to raise their voices to communicate with bell persons at the bell desk and when the bell persons are retrieving luggage from their cars, increasing the potential amount of SARS-CoV-2 being dispersed.

32.     Bell persons also regularly had prolonged interactions with unmasked guests when the guest arrived or departed.  When the guest arrives, bell persons interact with guests as they place the guests' luggage onto bell carts.  When guests are indecisive about which luggage they wish to have carried on the bell cart, or when they need to repack their luggage prior to it being carried to their room, these interactions can take longer.  After bell persons bring luggage to guests' rooms, they again converse with guests, sometimes for 15 minutes or more.  Particularly since reopening, guests have questions about what is closed and open at MGM Grand or on the Strip.  Guests also have questions about their rooms, such as how the air conditioning works.  While bell persons may seek to socially distance during these interactions, it is often impossible to do so while also providing the standard of service that the Signature demands.  One bell person estimates that after the Signature reopened, he

COMPLAINT FOR INJUNCTIVE RELIEF                                    CASE NO.

assisted 25-30 guests a shift and, prior to June 24, only one guest wore a face mask while the bellman was assisting at the guest room.

33.     Valet drivers frequently park and retrieve 60 to 100 guest cars during their shift. Because the Signature has scheduled too few valet drivers, bell persons frequently cross-cover for valets and park and retrieve guest cars.  Guests are generally not wearing face masks when they drop off their cars for valet service.  The Signature has advised valet drivers and door persons to wipe down the interior touch points of guest cars, such as the seat, steering wheel, touch ignition button and door handles.  But because the Signature has not scheduled enough valet drivers and because all valet service is consolidated in Tower 2, valet drivers, cross-covering bell persons, and door persons are not given sufficient time to thoroughly disinfect the cars that valets are entering. Workers who enter a car immediately after a guest exits face the possibility of exposure to droplets containing SARS-CoV-2. In laboratory conditions, SARS-CoV-2 remains viable on surfaces common to automobile interiors, notably plastic, glass and stainless steel, for 2-7 days.   Van Doremalen N., Bushmaker T., Morris D.H., et al. Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1. *N Engl J Med*. 2020;382(16):1564-1567.  Yet, guest vehicles that valets drive are not allowed to sit open and ventilate for a sufficient period of time to allow for any droplets containing SARS-CoV-2 particles to dissipate. Valets have essentially no way of knowing whether they are entering a vehicle that has only minutes earlier been occupied by a guest who is coughing or sneezing SARS-CoV-2 into the vehicle's interior atmosphere and onto its surfaces.

34.     At least three valets and bellmen in The Signature front-service department have tested positive for COVID-19.  The Signature's procedures and rules for addressing positive COVID-19 cases are unreasonable and unsafe for Signature workers, their families, and their communities.

35.     On June 5, 2020, The Signature held a training on its COVID-19 procedures for valet, bell persons, and door persons.  The training took place at the MGM Convention Center and in a meeting room at The Signature.  At least two Signature employees who later tested positive for COVID-19 attended the training and were in proximity to one another, a valet named Jose Chavez and a bellman named Sixto Zermeno.

COMPLAINT FOR INJUNCTIVE RELIEF                          CASE NO.

36.     Sixto Zermeno worked as a bellman on June 7, 8, and 9.   Because the valet desk was so busy during his shifts on June 7, 8, and 9, he often had to cross-cover for valet, by helping customers at the valet desk or by parking or retrieving guest cars.   During his shift on June 9, for example, he loaded approximately 50-60 cars into a ramp used to store cars prior to valets parking them.

37.     On June 10, 2020, Sixto Zermeno woke with a terrible headache and body aches.   He is an on-call bellman, and so receives calls from the MGM Virtual Roster system alerting him that he is scheduled to work on a particular day.   When Sixto Zermeno received a call from MGM Virtual Roster on June 10, he told the representative that he was too sick to work.   The representative did not ask about his condition or provide any advice, but simply stated that the representative would try the next bell person for scheduling.

38.     Because Sixto Zermeno was concerned that his symptoms were consistent with COVID-19, he got tested.   On June 11, 2020, he received his results, which showed that he had tested positive for COVID-19.

39.     After Sixto Zermeno received his positive test result, he diligently attempted to warn The Signature and its parent company, MGM Resorts.   He called his front-line manager at the Signature, Michael Short, but was unable to reach him.   Sixto Zermeno then called the front-desk manager, who transferred him to The Signature's General Manager, Estephanie Flores.   He told the General Manager that he had tested positive for COVID-19 and asked her what he was supposed to do. The General Manager told him that he should call MGM's Virtual Roster scheduling system.   But when Sixto Zermeno called MGM's Virtual Roster system, the representative told him that MGM Virtual Roster was not the right place to report a positive COVID-19 test.   The representative from MGM Virtual Roster gave Sixto Zermeno yet another person to call, from MGM Resorts's corporate office. When Sixto Zermeno told that MGM representative that he had tested positive for COVID-19, she told him that he should text and email his positive result to her.   The MGM representative did not ask Sixto Zermeno any questions about whom he had contact with at work or give him any other guidance on what he should do.   The same day, on June 11, Sixto Zermeno texted and emailed his positive test result to the MGM representative.

40.     Despite having evidence of a positive COVID-19 test result from a symptomatic bellman, The Signature did not immediately close down the work areas in which Sixto Zermeno worked on June 11 or June 12, such as the bell desk or the valet booth, so that they could receive special and complete disinfection.  It did not immediately warn all potentially affected employees that one of their co-workers had tested positive.  The Signature could have done so without compromising Sixto Zermeno's privacy.  Nor did The Signature initiate contact tracing to determine which of Sixto Zermeno's co-workers needed to be quarantined.  Instead, bellmen who had worked shifts with Sixto Zermeno were permitted to continue to assist guests and interact with their co-workers, and valets who had worked with Sixto Zermeno continued to park and retrieve guest cars.

41.     On June 12, during the morning shift, The Signature held a 20 minute meeting with valets, bell persons, and door persons, many of whom had by now heard from Sixto Zermeno himself that he had tested positive.  The Signature's Director of Operations sought to assure those present that only those who had been with the employee who tested positive for more than 15 minutes had anything to worry about.  Neither the Director of Operations, The Signature, nor MGM conducted any interviews with bell persons or valets during the 20-minute meeting or afterwards to determine their level of risk.  Instead, the Director of Operations said that The Signature would be "reviewing surveillance footage" to try to determine who might have been exposed to Sixto Zermeno.  The Signature did not announce the positive COVID-19 to all employees working shifts later in the day on June 12.

42.     Although Sixto Zermeno had notified an MGM Resorts representative on June 11 that he had tested positive, no one from The Signature or MGM Resorts contacted him to conduct contact tracing with him until two days later, on June 13.  Sixto Zermeno provided names of co-workers with whom he had close contact at The Signature.  Among the first people he named was a valet named Jose Chavez.  But despite Sixto Zermeno's informing MGM Resorts on June 11 of his positive test result, and despite his notification of The Signature and MGM Resorts that he had been in close contact with Jose Chavez, no representative of The Signature or MGM Resorts contacted Jose Chavez to inform him that he had been in close contact with an individual who had tested positive, nor did The Signature or MGM Resorts quarantine Jose Chavez to protect other Signature employees and the public.

43.     Instead, Jose Chavez worked full eight-hour shifts on June 12 and June 13, parking and retrieving guest cars and interacting with co-workers.  Because he had heard from a relative that Sixto Zermeno had tested positive for COVID-19, Jose Chavez—on his own accord—got tested for COVID-19.

44.     Jose Chavez worked again on June 14.  Approximately halfway through his shift, Jose Chavez received a text message informing him that COVID-19 had been "detected" in his test. Because he was not sure what the text meant, he showed it and spoke with co-workers, including bellman Zackary Mueller.  Zackary Mueller advised Jose Chavez that he thought this meant he had tested positive for COVID-19.  Jose Chavez showed the text message to The Signature's Director of Operations.  The Director of Operations told Jose Chavez that Jose Chavez could either stay working or go home.  Jose Chavez elected to go home at 1:00.  He subsequently learned that he had indeed tested positive for COVID-19.

45.     After Jose Chavez informed The Signature Director of Operations that he had received a positive test for COVID-19, The Signature did not immediately close the work stations in which Jose Chavez had worked that day.  Plaintiff is informed and believes, and thereon alleges, that The Signature did not immediately conduct the proper and mandated cleaning and disinfection regimen advised by the CDC.  Nor did The Signature announce to valet, bell, or door employees on the shift that a co-worker had tested positive for COVID-19 or advise them of precautions that they should take.

46.     On June 14, valet Eric Mead was scheduled to work from 2:30 to 10:30.  As he prepared for work, Eric Mead had a migraine headache, sore throat, and diarrhea.  He arrived early to his shift to talk with his manager about his condition.  Eric Mead asked his front-line manager, Michael Short, whether he should be concerned about having worked with Sixto Zermeno, who had tested positive. Eric Mead also told his front-line manager that he had a migraine headache, sore throat, and diarrhea. The front-line manager told Eric Mead that "those aren't symptoms" of the virus and that Eric Mead could continue working.  After Eric Mead clocked in for his shift, he spoke with The Signature Director of Operations and said that he was concerned about his symptoms and about having worked with the bell person who tested positive.  The Director of Operations stated that he would look into it.

COMPLAINT FOR INJUNCTIVE RELIEF                                    CASE NO.

47.     Despite having worked with a co-worker who tested positive, and despite alerting his managers that he was experiencing symptoms that the CDC advises are associated with COVID-19 and asking whether he should nonetheless work, Eric Mead worked for six hours on June 14.

48.     Although Sixto Zermeno notified The Signature and MGM on June 11 that he had tested positive for COVID-19, and sent his test results on the same day, no representative of the Southern Nevada Health District ("SNDH") contacted Sixto Zermeno until *over two weeks later*, on June 24, 2020.  On that day, a representative of SNDH sent Sixto Zermeno a letter stating that "Southern Nevada Health District (SNHD) is no longer recommending Sixto Zermeno (DOB: 06/15/1988) be excluded from work. Sixto is able to return to his normal employment duties effective immediately." This letter was apparently based on the fact that Sixto Zermeno had been in quarantine for 13 days since his positive test result was reported.  But Sixto Zermeno continued to test positive for COVID-19, and is unsure whether he is required to report back to work despite a positive test result.

49.     The Signature's unreasonable procedures for responding to positive COVID-19 cases among its employees and its requirement that employees work in proximity to unmasked guests has caused significant harm to Joint Board members and their families.  Sixto Zermeno lives with two elderly parents, who he is worried may now contract COVID-19.  He has had remain separated from his daughter for weeks for fear of spreading the disease to her.  Since he tested positive for COVID-19, Jose Chavez's wife and two children have also tested positive.  Other Signature employees have family members who are at heightened risk if they contract the disease.

50.     Plaintiff is informed and believes that at least two other Signature workers in the front-area department have tested positive for COVID-19, that Signature did not immediately close the work areas in which these workers worked after learning of their positive tests, that Signature did not immediate inform co-workers of the positive tests, and that Signature did not immediately conduct contact tracing to determine which co-workers may have been exposed.

51.     Signature valets and bell persons must also live in the constant fear that they are working in proximity to co-workers exposed to COVID-19 and that they are entering cars that have recently been used by unmasked guests who have COVID-19 and were only recently in the confined space of the guest vehicle.  This fear and anxiety is heightened by The Signature's failure to provide

16

employees with prompt information when co-workers test positive and its failure to follow reasonable contact-tracing and quarantine procedures.  One bell person described working under these conditions as akin to a game of "Russian Roulette."

### Harrah's Allegations

52.     Harrah's is a hotel and casino located at 3475 South Las Vegas Boulevard.  Harrah's consists of a hotel consisting of two towers with approximately 2,500 guest rooms, a casino with approximately 90,000 square feet of gaming space, as well as bars, restaurants, and retail stores.  Harrah's is connected to another hotel, The LINQ, by a retail and food corridor called the Promenade.  The Promenade contains retail stores and restaurants.  Among the restaurants located in the Promenade is Guy Fieri Vegas Kitchen and Bar ("Guy Fieri").  Guy Fieri is co-managed by Harrah's and workers at Guy Fieri are covered by the Harrah's collective bargaining agreement.

53.     Like The Signature, until June 24, 2020, Harrah's allowed its guests to be on its property without wearing face masks.  As a result, Harrah's workers regularly had to interact with unmasked guests while in close proximity to them.  Harrah's workers are regularly unable to remain at a socially distanced location while serving guests.

54.     Unlike some other casinos, Harrah's did not install plexiglass shields at bars that it has reopened.  Groups of guests congregate at the Numb Bar, Carnival Court, Piano Bar and Signature Bar in Harrah's waiting to be served, and interact with bartenders from just feet away.  Prior to June 24, these guests did not wear masks, so bartenders were unprotected from respiratory droplet containing virus that the guests might spread by yelling or coughing.

55.     Due to the high level of ambient noise on the casino floor at Harrah's, and at bars located within Harrah's, as well as the festive atmosphere within the casino and the presence of alcohol, guests regularly speak loudly and even yell when interacting with bartenders, food servers, and cocktail servers at Harrah's.  In order to clearly make out drink orders, bartenders and cocktail servers frequently must incline their heads toward the patron.  The combination of unmasked guests speaking at loud volumes and the proximity of bartenders and servers to guests placing orders put Harrah's cocktail servers, food servers, and bartenders at great risk of being exposed to SARS-CoV-2.

56.     Until June 24, 2020, other Harrah's workers represented by the Joint Board, including guest room attendants, food servers, bell persons, and front-desk agents were required to interact with guests who were not wearing face masks.  These interactions frequently take place at less than six feet of distance.

57.     Joint Board members' exposure to COVID-19 from unmasked guests should have made Harrah's especially careful when it determined that an employee had tested positive for the virus, but it did not.

58.     Harrah's co-manages Guy Fieri, which is located in the Promenade.  A food runner at Guy Fieri tested positive for COVID-19 on June 18.  The food runner who tested positive for COVID-19 worked on June 12, 13, and 14.  On June 12, cooks and food runners held a "huddle" meeting with the food runner, at which workers were less than six feet away from the food runner.  In addition, during shifts that the food runner worked on June 12, 13, and 14, he interacted with cooks and other food runners, as well as servers.  Because the kitchen at Guy Fieri is loud, it is often impossible to communicate with co-workers without being less than six feet away.  For example, specialty cook Jessica Bremer works in the kitchen at Guy Fieri, and on June 12, 13 and 14, worked closely with the food runner who tested positive.  The food runner would park his cart in the work area immediately adjacent to Jessica Bremer's kitchen station.  They were in close proximity to one another during each of these three shifts.  Cook Pedro Tapia also worked in the kitchen during shifts on which the food runner who tested positive would enter the kitchen approximately twice per hour, staying approximately 5 to 10 minutes each time.  Because the kitchen is a small, enclosed space, it was not possible to socially distance in it at all times.  Similarly, on June 14, cook Elsa Kaufmann worked with the food runner who tested positive, and worked in close proximity to him for more than 15 minutes while helping him to clean walk-in refrigerators and storage areas.  Other co-workers of the food runner also worked in proximity to him during his shifts on June 12, 13, and 14.

59.     Plaintiff is informed and believes that Harrah's was aware that the food runner had tested positive, or was suspected to have COVID-19 due to the symptoms he reported, on June 18, 2020.

60.     Although Harrah's knew that the food runner had tested positive, and although Harrah's policy and CDC and state guidelines require that Harrah's block off areas in which the food runner had worked during the previous seven days so that they may be thoroughly cleaned and disinfected, Harrah's permitted employees to continue working in these areas.  The areas in which the food runner worked have hard surfaces, such as stainless steel and glass, on which droplets containing the SARS-CoV-2 virus are known to remain viable.

61.     On June 18, 2020, many Guy Fieri workers had learned that the food runner had tested positive, either by speaking or texting with the food runner, or by learning from a co-worker who had. Even though Harrah's was aware that the food runner had tested positive for COVID-19, Harrah's did not announce this fact to Guy Fieri workers so that they could take precautions.  Instead, several Guy Fieri workers confronted their front-line managers to demand to know whether it was true.  For example, specialty cook Jessica Bremer asked manager Brian Hendricks whether it was true that the food runner in question had tested positive for COVID-19.  Manager Brian Hendricks confirmed to Jessica Bremer that it was true.  Jessica Bremer reminded Manager Brian Hendricks that she has an underlying condition that makes her particularly vulnerable if she contracted COVID-19.  Manager Brian Hendricks responded that Jessica Bremer would "have to deal with it."  Bremer then approached another manager, "Chef Dylan," and reminded him of her underlying condition.  Chef Dylan did not ask Jessica Bremer about the extent of her contact with the food runner who had tested positive or send her home to quarantine.  Instead, Chef Dylan directed Jessica Bremer to continue working.  Other Guy Fieri workers also received confirmation from their managers that the food runner had tested positive, but were also expected to keep working.

62.     Guy Fieri servers, food runners, and cooks continued working and serving guests on June 18, including in areas that the food runner who had tested positive had used within the previous seven days.  In the late afternoon, a Harrah's food-and-beverage manager informed Guy Fieri workers that Harrah's would assess who had been exposed to the food runner by "reviewing surveillance video." Later on June 18, a human-resources manager spoke with Guy Fieri cooks.  Rather than send home employees who may have been exposed, she told the gathered cooks that they "knew too much" and that the "situation was out of control."

63.     Harrah's did not send home workers while it allegedly conducted a review of surveillance footage, nor did it immediately attempt to assess who had had close contact with the food runner by interviewing Guy Fieri workers.  As a result, Guy Fieri workers continued to work in proximity to one another for the remainder of their shifts.  Nor did Harrah's conduct full and appropriate contact tracing on the night of June 18.  Rather, Guy Fieri workers returned on June 19 for their regularly scheduled shifts.  For example, on June 12, 13 and 14, cook Eric Weininger worked closely with the food runner who tested positive.  Despite the fact that he had worked in proximity to the food runner, he was not told to stay home on June 19 or to self-quarantine.

64.     On June 19, Eric Weininger and four Guy Fieri co-workers arrived at the security checkpoint at the employee entrance.  A sign at the entrance contains a COVID-19 questionnaire, including whether they had been in contact with someone who had tested positive for COVID-19.  Weininger and the other Guy Fieri workers announced that they had been in contact with someone who had tested positive for COVID-19.  They were asked to stand aside and wait.

65.     Approximately 10 minutes later, a person who identified himself as the Assistant Head of Security and a human resources representative arrived.  After Weininger informed them that the gathered workers had worked in proximity to a co-worker who had tested positive, the Assistant Head of Security told the five Guy Fieri workers, falsely, that they did not need to worry because the temperature scanners that they passed through would detect the virus because the "first sign is a fever." Weininger pointed out that the food runner who had tested positive had also passed through the scanner.  The Assistant Head of Security also stated that because the gathered workers had last worked with the food runner on June 14, it was possible that the food runner had contracted the disease on "from McDonald's, Smith's, or buying a pack of cigarettes."  The Assistant Head of Security sought to pressure the Guy Fieri workers into going to work by repeatedly, and pointedly, asking them to confirm and re-confirm they had been in contact with the sick employee.  The Assistant Head of Security did this in an attempt to solicit of negative responses from the gathered Guy Fieri workers, so that they could be required to work.  After asking the gathered Guy Fieri workers whether they had been in contact with the sick food runner for a third time, the Assistant Head of Security asked the gathered Guy Fieri workers whether they practiced social distancing and wore face masks.  When the gathered

20

workers responded that they did but that the kitchen at Guy Fieri was very small, the Assistant Head of Security stated that the gathered workers "all looked ready to work" to him.

66.     Even though the gathered Guy Fieri workers had informed Harrah's representatives that they had worked closely with someone who had tested positive for COVID-19, the human resources manager present gave the gathered workers the option of either getting tested that day or coming in to work their shifts.  Despite the pressure that had been put on them to ignore the risks of continuing to work by the Assistant Head of Security, all of the gathered Guy Fieri workers courageously elected not to work and instead to be tested.

67.     Other Guy Fieri workers, however, were not asked by Harrah's human resources managers or security about whether they had worked in proximity to the sick food runner when they arrived for their shifts on June 19. They were permitted to enter the property for their shifts at Guy Fieri.  No prep cook or food runner came to work at Guy Fieri that day, and only two servers and two bartenders did.  One of the cooks who returned to work on June 19 had had close contact with the food runner who tested positive.  Only after it became clear that there were insufficient workers to run the restaurant did the Guy Fieri manager on duty elect to close the restaurant.  The manager did not tell the Guy Fieri employees who were on duty that they should quarantine, nor did he ask them questions to determine who might have worked in proximity with the food runner who tested positive.  Later that afternoon—only after it became clear that there were insufficient workers to run the restaurant—Harrah's human resources managers called some Guy Fieri workers to tell them they should quarantine.

**Bellagio Allegations**

68.     Bellagio operates the Bellagio Hotel and Casino at 3600 S Las Vegas Blvd.  Among the food and beverage venues that Bellagio operates at the Hotel and Casino is Sadelle's Café, a breakfast and lunch venue overlooking Bellagio's Conservatory & Botanical Gardens.

69.     Bellagio was aware of the public health consensus that mandatory face mask wearing was essential to protecting its employees and preventing the spread of COVID-19, including SNHD's admonition that "[b]usinesses have a moral obligation to protect this community by implementing policies that require their patrons to wear masks in public areas."   Yet, Bellagio did not require guests

COMPLAINT FOR INJUNCTIVE RELIEF                              CASE NO.

on its property to wear face masks until Nevada's Governor ordered it to do so on June 24, 2020, twenty days after Bellagio's June 4 reopening.

70.     As a result of Bellagio's irresponsible decision to permit guests to remain unmasked on the property it operates, Bellagio bartenders, cocktail servers, food servers, hosts, cashiers, bell persons, guest room attendants, door persons, valet, and employees working in other classifications regularly came into close contact with guests who did not wear masks.  Socially distancing from unmasked guests while serving them in the manner that Bellagio requires was frequently impossible, and the loud environment of the casino floor, Bellagio bars, and open area food venues such as Sadelle's, meant that unmasked guests had to speak loudly and even yell to communicate effectively with Joint Board members.

71.     Joint Board members' exposure to COVID-19 from unmasked guests should have made Bellagio especially careful when it determined that an employee had tested positive for the virus, but it did not.

72.     On June 11, 2020, a food runner at Sadelle's Café informed Bellagio that he had tested positive for COVID-19.  The Sadelle's kitchen is set up with two long tables on either side of a five-foot-wide corridor. One is where food comes out from the hot line, the other is where the food comes out from the cold line. The two lines are about ten to fifteen feet wide.  There are usually five to six runners working at a time.  While runners wait for food, they stand in the corridor between the two tables.  Food runners can stand in that space from five to twenty minutes at a time, depending on how long an order takes to come out.  They cannot stand more than six feet away from the other runners when they are in that space.  Not only is there not enough space, but food runners also have to pick up food from different parts of the line so they have to cross by each other regularly.  Bellagio did not institute any new procedures to assist food runners in performing their jobs while socially distancing from one another or from cooks in the kitchen.

73.     The food runner who tested positive for COVID-19 worked in close proximity to other Sadelle's workers, including food runners and cooks, during his shifts on June 6, 7, 8, and 9, and potentially on other dates.  For example, food runner Jaime Young worked with the food runner who later tested positive for COVID-19 on or around June 9, during which the food runner was coughing

COMPLAINT FOR INJUNCTIVE RELIEF                                    CASE NO.

and reported that his wife had been sick for a week and a half with a fever, body aches, and was unable to move or breathe well.  The food runner informed Jaime Young that he planned to take his wife to the doctor the following day, his day off.  Food runner Teodoro Romero worked with the food runner who tested positive on June 7, 8, and 9.  Teodoro Romero helped the food runner with closing the restaurant by setting up for the next day, including by refilling ramekins with condiments.  While doing those tasks, Teodoro Romero was standing not more than three feet from the food runner who tested positive. It took about thirty minutes to refill all the ramekins.  Food runner Rafael Avila worked with the food runner who tested positive on multiple shifts, and exchanged money with him.

74.    Plaintiff is informed and believes, and thereon alleges, that Bellagio was aware of the food runner's positive test result for COVID-19 by June 11, 2020.  On June 11, 2020, Sadelle's manager Jessica Kang spoke to Teodoro Romero and another food runner to tell them that there had been a positive COVID-19 case at Sadelle's.  Manager Jessica Kang did not advise the food runners whether the positive COVID-19 case was a guest or a co-worker.  Kang told Teodoro Romero not to worry about the positive test because they were washing hands and wearing masks, but she suggested that they get tested.  Neither Kang nor anyone else from Bellagio sought to assess whether Teodoro Romero had worked in close proximity to the food runner who tested positive, which he had, or advised Teodoro Romero that he should quarantine himself.  Teodoro Romero continued to work his shift on June 11.

75.    Similarly, Manager Jessica Kang spoke to food runner Jamie Young on June 11 and informed Young that someone had tested positive for COVID-19.  Manager Kang made no effort to determine whether Jamie Young had close contact with the food runner who tested positive or advise Jamie Young that she should quarantine as a precaution.  Jamie Young continued to work her shift on June 11.

76.    On Friday, June 12 at 7 a.m. Bellagio's Human Resources department called Jamie Young to tell her that one of her co-workers had coronavirus and she should get tested.  Jamie Young informed the Bellagio Human Resources representative that she thought she had been in close proximity to the food runner that Jamie Young believed to be the positive COVID-19 case.  She asked Human Resources representative if she should wait for her test results on Monday before returning to

work.  The Bellagio Human Resources representative told Jamie Young that she would be safe to return for her shift on Sunday as long as she wore a face mask.  The Bellagio Human Resources representative did not advise Jamie Young that she should quarantine for 14 days, as CDC guidelines require.  On Sunday, Manager Kang called Jamie Young to ask whether Jamie Young would be at her shift on Monday.  Jamie Young told Kang that she did not feel comfortable going to work when she had worked closely with a co-worker who had tested positive and had not received her test results.

77.     Other Sadelle's employers who worked with the food runner who tested positive were not informed of their co-worker's positive test on June 11 or afterwards.  Plaintiff is informed and believes, and thereon alleges, that Sadelle's did not immediately shut down the work areas where the food runner who tested positive had worked less than seven days earlier, including the areas of the kitchen where the food runner worked or the corridor between the hot and cold food lines where food runners congregate during their shifts.

78.     On June 24, 2020, Sadelle's cook Eremias Lopez Garcia learned from his doctor that he had tested positive for COVID-19.  Eremias Lopez Garcia had been in contact with the food runner who tested positive earlier, when the food runner was coughing in his presence.  Eremias Lopez Garcia informed Bellagio Human Resources on June 24 of his positive test.  He also agreed to allow Bellagio to disclose his name to his co-workers, so that they could be warned of his positive test.  He also informed his manager at Sadelle's, Chef Michael Vargas, who said that he would take care of the paperwork.

79.     Despite knowing on June 24 of Eremias Lopez Garcia's positive test result, and despite having Eremias Lopez Garcia's permission to disclose his name, Bellagio did not immediately inform all Sadelle's employees of the presence of a positive COVID-19 case at their workplace, nor disclose Eremias Lopez Garcia's name so that others at the restaurant could determine whether they had worked in close contact with him.

80.     Instead, Bellagio waited until June 25 to inform front-of-the-house workers (servers and food runners) of the positive COVID-19 test.  At a June 25 pre-shift meeting, Manager Jessica Kang told the assembled front-of-the-house workers that there was an active COVID-19 case "in the back of

the house" but did not identify who the person was.  Manager Kang simply told the assembled servers and food runners to keep washing their hands and wearing masks.

81.     On June 24, Chef Michael Vargas informed cooks that Eremias Lopez Garcia had tested positive for COVID-19.  Despite the fact that cooks work in close proximity to one another— sometimes shoulder to shoulder at their work stations—Chef Vargas did not tell cooks working that day that they should quarantine or leave work.  He simply stated that cooks should get tested.

82.     On June 25, Chef Vargas told Sadelle's cook Alejandro Salcido that the cooks would all have to go get tested for COVID-19 because they had worked with Eremias Lopez Garcia.  Alejandro Salcido stated to Chef Vargas that if the cooks all got tested, they would have to stay home until they got their test results.  Chef Vargas stated to Alejandro Salcido that the cooks could not stay home because Chef Vargas had a restaurant to run.

83.      On June 26, 2020 at 9:00 a.m.—two days after Eremias Lopez Garcia had informed Bellagio of his positive test—Chef Vargas cook spoke to Sadelle's cook Oscar Garcia to determine how closely he had worked with Eremias Lopez Garcia.  Chef Vargas asked Oscar Garcia whether he had sat, ate, or spoken with him.  Oscar Garcia told Vargas that he had worked shoulder to shoulder with Ermias Lopez Garcia for most of their shifts together and that they crossed paths constantly. Despite being told that Oscar Garcia had worked in close contact with Eremias Lopez Garcia, Vargas did not tell Oscar Garcia that he should not return to work, and Oscar Garcia continued to work until his shift ended at 5:00 p.m. that night.  During their conversation, Vargas told Oscar Garcia that someone from human resources might call him, but as of June 26 at 8:30 p.m., no one had.

84.     Plaintiff is informed and believes, and thereon alleges, that Sadelle's did not close down the kitchen work station at which Eremias Lopez Garcia had worked so that it could be deep cleaned.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION: INJUNCTIVE RELIEF
#### (29 U.S.C. § 185)

85.     Plaintiff Joint Board hereby incorporates paragraphs 1 through 84, inclusive, as though fully set forth herein.

86.     Defendants are parties to collective bargaining agreements with Plaintiff Joint Board.

These collective bargaining agreements contain provisions for the grievance and arbitration of disputes.

87.     Defendants' collective bargaining agreements permit the Joint Board to grieve and arbitrate the reasonableness of rules and procedures affecting bargaining-unit workers.  This includes rules and procedures that impact bargaining-unit workers' safety while they are on the job.  The Signature and Bellagio have expressly agreed with the Joint Board in the collective bargaining agreement that "[t]he safety of its employees is of paramount concern and that it will take reasonable measures to provide a safe workplace for all employees."

88.     Defendants have violated these collective bargaining agreement provisions by adopting rules and procedures affecting workers' health and safety that are manifestly unreasonable and that endanger Joint Board members' safety.  Specifically, Defendants have adopted manifestly unreasonable rules and procedures for addressing instances in which a worker tests positive for COVID-19.  These unreasonable rules and procedures (1) permit Defendants to continue to operate and to require Joint Board members to continue to work, without designating a COVID-19 contact person for each shift, clearly informing staff at each shift who that person is and training designated contact people and Joint Board members in the scientifically accurate protocols for reporting, quarantine and isolation (2) permit Defendants to continue operating without immediately closing and conducting deep cleaning of the infected worker's work areas; (2) permit Defendants to continue operating, and to require Joint Board members to continue to work, without immediately informing the Joint Board members that a co-worker has tested positive for COVID-19; (3) permit Defendants to continue operating, and to require Joint Board members to continue working, without immediately conducting any contact tracing to determine whether co-workers have potentially been exposed to the virus, so that they Joint Board members may quarantine; and (4) permit untrained and unqualified managers and security personnel to pressure Joint Board members to continue working even when they complain of symptoms associated with COVID-19 or have worked in close contact with someone who has tested positive for COVID-19.

89.     The Joint Board has grieved these violations of its collective bargaining agreements with Defendants.

90.     However, any arbitration that takes place over the unreasonable rules and procedures that Defendants have adopted will take many months to address the grievances described herein. While those arbitrations are pending, Joint Board members' health and lives are being put at risk.  If an arbitrator later agrees that the work rules and procedures that Defendants have adopted, as described herein, are unreasonable, the arbitrator will not be able to fashion a remedy that provides any relief to Joint Board members have been unnecessarily exposed to a life-threatening virus in their workplace.

91.     Labor Management Relations Act Section 301, 29 U.S.C. § 185, grants federal courts jurisdiction to issue injunctions in aid of arbitration where (1) the collective bargaining agreement contains a mandatory arbitration provision; (2) the underlying dispute is arbitrable; (3) the party seeking arbitration is prepared to arbitrate; and (4) issuance of an injunction would be warranted under ordinary principles of equity: whether breaches are occurring and will continue, or have been threatened and will be committed; whether the breaches have caused or will cause irreparable injury to the Union; and whether the Union will suffer more from the denial of an injunction than will the Employer from its issuance.  *Newspaper & Periodical Drivers' & Helpers' Union, Local 921 v. San Francisco Newspaper Agency*, 89 F.3d 629, 632 (9th Cir. 1996).  Each of these requirements is met in this case.

## SECOND CAUSE OF ACTION: STATUTORY NUISANCE
## (NRS 40.140)

92.     Plaintiff Joint Board hereby incorporates paragraphs 1 through 91, inclusive, as though fully set forth herein.

93.     Nevada Revised States 40.140(1)(a) defines "nuisance" as "[a]nything which is injurious to health . . . so as to interfere with the comfortable enjoyment of life or property."  NRS 40.140 permits any person . . . whose personal enjoyment is lessened by the nuisance" to bring an action seeking a judgment under which "the nuisance may be enjoined or abated[.]"

94.     The acts and omissions of Defendants described herein have caused Joint Board members, their families, and the people with whom they reside to suffer increased exposures and risks of exposures to COVID-19.  These acts and omissions substantially and unreasonably created and substantially assisted in creating a grave risk to Joint Board members' health and safety, and so

wrongfully and unduly interfered with Plaintiffs' comfortable enjoyment of their lives.  Defendants have committed these acts and omissions knowingly and willfully.

95.    The nuisance caused by Defendants' acts and omissions has caused and will continue to cause injury to Joint Board members, due to the heightened risk of exposure that they face in the workplace, the infections that they have suffered and will continue to suffer (as well as those of family members and others with whom they share a residence), the loss of income they face as a result of having to stay home from work because of their exposure, and the increased anxiety and mental distress they suffer as a result of their exposure to the virus.

96.    Left unabated, Defendants' failure to comply with necessary health and safety standards at their properties is reasonably certain to cause further spread of the virus among Joint Board members, their families, and those with whom they share residences.  If injunctive relief abating these nuisances is not granted, Plaintiff and its members face a significant risk of irreparable harm in the form of contracting COVID-19, with its long-term health consequences and potentially fatal nature. The risk of these harms greatly outweighs any harm that would be suffered by Defendants from abating these nuisances by following necessary, minimum standards for responding to instances of positive COVID-19 cases among workers.

97.    Other authorities in Nevada have proven inadequate to protect Joint Board members from the harms alleged in this complaint and the wrongful conduct by Defendants alleged in this complaint.  OSHA and Nevada/OSHA, the principal government agencies tasked with ensuring workplace safety, have not issued guidelines or assumed responsibility for employer's obligations when a have deprioritized inspections and enforcement at non-medical workplaces.  Southern Nevada Health District has limited enforcement power and has proven unable to respond to positive COVID-19 tests among Joint Board members with anything close to the speed required.  For example, while Sixto Zermeno reported to MGM on June 11 that he had tested positive for COVID-19, no representative from the SNHD contacted him until June 24, nearly two weeks later.  Indeed, the SNHD has admitted that the database it uses does not allow health officials to sort cases by casino.  The CDC, while able to issue recommendations, does not have or exercise independent enforcement authority against businesses that fail to follow those recommendations.

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner Joint Board prays for a judgment against Defendants as follows:

1.      For injunctive relief in aid of arbitration pursuant to Labor Management Relations Act § 301, 29 U.S.C. § 185, enjoining Defendants from promulgating and following unreasonable rules and procedures described herein that are the subject of pending grievances, until such time as arbitration of those disputes is completed.

2.      For preliminary and permanent injunctive relief abating the nuisances described herein.

2.      That Petitioner Joint Board be awarded its costs and expenses of suit;

3.      That Petitioner Joint Board be awarded reasonable attorneys' fees incurred in this suit; and

4.      For an award of any such other relief as this Court deems just and proper.

Dated: June 29, 2020                    Respectfully Submitted,


**McCRACKEN, STEMERMAN & HOLSBERRY, LLP.**


Paul L. More, SBN 9628
Sarah Varela, SBN 12886
Kim Weber, SBN 14434
**McCRACKEN, STEMERMAN & HOLSBERRY, LLP**
1630 South Commerce Street, Suite 1-A
Las Vegas, NV 89102
Tel: (702)386-5107
Fax: (702)386-9848
E-mail:  pmore@msh.law


*Attorneys for Plaintiff Local Joint Executive Board*

29